216

736 S.E.2d 683

Ella Ranette Miller GAFFNEY, Respondent,

v.

William Wright GAFFNEY, Jr., Appellant.

Appellate Case No. 2011–196446.

No. 5068.

Court of Appeals of South Carolina.

Heard Dec. 12, 2012.
Decided Dec. 28, 2012.

Jeffrey A. Merriam, of Carter Smith Merriam Rogers & Traxler, PA, of Greenville, for Appellant.

Timothy E. Madden and Reid T. Sherard, both of Nelson Mullins Riley & Scarborough, LLP, of Greenville, for Respondent.

PER CURIAM.

William Wright Gaffney, Jr., (Husband) appeals the order of the family court interpreting the parties' divorce decree. On appeal, Husband argues the family court erred in finding that, under the terms of the decree and the settlement agreement underlying it, the loan obligor's full payment of the principal balance owing reduced Husband's alimony obligation from $7,000 to $1,000 instead of eliminating it entirely. We reverse.

**FACTS**

In 2009, after thirty-four years of marriage, Ella Ranette Miller Gaffney (Wife) commenced an action for an order of separate maintenance and support, equitable distribution of property, and other relief. At the final hearing on March 30, 2009, the family court permitted Wife to amend her pleading to seek an order of divorce on the basis of one year's separation, and Husband did not object.

Two weeks later, the family court issued its order granting Wife a divorce. It merged into that order the parties' written Marital Settlement Agreement dated March 5, 2009, and an amendment to that document dated March 30, 2009 (collectively, the MSA).

## I. The MSA

According to the MSA, both parties were in their fifties and in good health. Husband, who was fifty-nine years old, was a co-owner and the president of Citadel Management, LLC (the LLC). Wife, who was fifty-six, received "nominal income"[1] from her part-time employment in a retail store. The parties agreed to divide their assets more or less evenly, with Wife receiving the marital home and Husband receiving business interests other than the parties' interests in the LLC.

---

1. Wife's financial declaration reflects she earned $300 per month from her retail employment. However, the majority of Wife's financial security does not lie in her monthly income, whether from earnings or alimony: a worksheet in the record demonstrates Wife received property worth more than $2.3 million.

Each party retained his or her respective ownership interest in the LLC. Wife retained a fifteen-percent ownership interest and Husband, a thirty-five-percent interest. In addition, each party received fifty percent of a note receivable that the LLC owed to Husband and Wife.[2]

With regard to alimony, Husband acknowledged "his ability to be self-supporting without contribution from Wife" and waived alimony. He also agreed to pay Wife $7,000 per month in alimony, with a maximum of one hundred twenty payments.

The amount of alimony would be modifiable downward based upon a substantial change in circumstances. Moreover, the parties agreed:

> This alimony shall be offset dollar for dollar for any interest income Wife receives from her share of the note receivable from [the LLC]. If [the LLC] ever reduces the principal on the debt due to Wife for the note receivable, then in such event Husband's alimony obligation to Wife shall automatically reduce proportionate to the reduction made in the principal obligation.

The written amendment incorporated into the MSA addressed Husband's obligations in securing health insurance for Wife. However, it also modified the alimony agreement. In order to provide Wife with health insurance benefits through the LLC, the parties agreed Wife would enter into a separate employment agreement with the LLC. The amendment concluded: "to the extent Wife is compensated under the employment agreement with [the LLC], any such compensation shall be credited against husband's alimony obligation owed to Wife by the terms of the [MSA]."

## II. Contempt Action

On April 13, 2011, Wife filed a complaint for contempt against Husband for failure to pay alimony and her health insurance costs. According to Wife, the LLC satisfied Husband's alimony obligation through January 2011: Wife received $6,000 per month in interest payments and an additional $1,000 per month for her employment with the LLC.

---

2. Although the MSA does not provide details about the note, other evidence in the record indicates the LLC owed the parties approximately $1,776,241.

Beginning in February 2011, the LLC paid off the principal amount of the loan due Wife, terminated her employment, and ceased making any further payments to her. As a result, Wife began paying her health insurance premiums of $402 per month out of pocket. Wife contended Husband owed her $1,000 per month in alimony from February 2011 forward, because the MSA provided the alimony obligation would be offset "dollar for dollar" by any amounts Wife received in interest on the loan or toward the principal of the loan.

Husband defended by quoting the alimony provision from the MSA and arguing it stated his obligation was to be reduced in proportion to the reduction in the principal amount owed Wife by the LLC, not dollar for dollar. He observed the MSA entitled Wife to a maximum of $840,000 in alimony ($7,000 × 120 months) and made no provision for an additional $1,000 per month. Furthermore, Husband stated Wife received $154,000 in alimony over the course of twenty-two months plus $888,120.58, which was the principal balance owing on her half of the parties' loan to the LLC.

At a hearing on June 24, 2011, the family court determined the alimony provision of the MSA was ambiguous and received testimony from the parties as to their intent. Husband testified they had agreed to divide the interest payments from the LLC of $12,000 per month evenly between them. He denied they intended for Wife to receive no more than $6,000 from the interest payments, explaining any additional alimony he paid would have come from his half of the interest payments because they were his only source of income at the time. However, he admitted the LLC issued a Form 1099 to each party reflecting income of $72,000 per year, or $6,000 per month, and that under the amendment to the MSA, Wife received the remaining $1,000 per month in alimony through her status as an employee of the LLC. Husband stated he did not believe "there was really any concern" about the source of his alimony payments, as long as he ensured Wife received the full $7,000 each month.

Wife testified the $6,000 per month in interest payments she received from the LLC was credited toward Husband's alimony obligation. Furthermore, she understood that when the LLC reduced the principal owing on the loan, any correspond-

ing automatic reduction in alimony would apply only to the $6,000 portion of alimony that was paid directly to her in the form of loan interest.

The family court expressed concern that the MSA did not directly state full payment of the loan by the LLC would negate Husband's alimony obligation. In its written order, it found Husband was not in compliance with the divorce decree and the MSA, but declined to find his non-compliance contemptuous. In reviewing the parties' intent when they executed the MSA, the family court found they had "intended that the automatic reduction available to [Husband] in the event of the payoff of the Note [was] proportionate to the total alimony obligation. Therefore the payoff of the Note results in a $6,000 per month reduction in total alimony obligation for Husband," leaving him owing Wife $1,000 per month. Husband appealed.

## STANDARD OF REVIEW

"In appeals from the family court, [appellate courts] review[ ] factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "[W]hile retaining the authority to make our own findings of fact, we recognize the superior position of the family court judge in making credibility determinations." *Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011). The burden is upon the appellant to convince the appellate court that the preponderance of the evidence is against the family court's findings. *Id.* "Stated differently, *de novo* review neither relieves an appellant of demonstrating error nor requires us to ignore the findings of the family court." *Id.* at 388–89, 709 S.E.2d at 654.

## LAW/ANALYSIS

Husband asserts the family court erred in interpreting the MSA to permit the full repayment of the parties' loan to the LLC to reduce his monthly alimony obligation by only $6,000. We agree.

"The interpretation of [marital litigation] agreements is a matter of contract law. When an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties as found

within the agreement." *State Mut. Ins. Co. v. Ard,* 399 S.C. 232, 237, 730 S.E.2d 912, 914 (Ct.App.2012) (citations and quotation marks omitted). "Unambiguous marital agreements will be enforced according to their terms . . ., regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully." *Davis v. Davis,* 372 S.C. 64, 75, 641 S.E.2d 446, 451–52 (Ct.App.2006) (citation omitted). A court will look to extrinsic evidence only if an ambiguity exists in the agreement's terms. *Nicholson v. Nicholson,* 378 S.C. 523, 534, 663 S.E.2d 74, 80 (Ct.App.2008) (citing *Charles v. B & B Theatres, Inc.,* 234 S.C. 15, 18, 106 S.E.2d 455, 456 (1959)).

Whether the language of a contract is ambiguous is a question of law to be determined by the court. *Silver v. Aabstract Pools & Spas, Inc.,* 376 S.C. 585, 591, 658 S.E.2d 539, 542 (Ct.App.2008). In making this determination, the court must examine the entire contract and not merely whether certain phrases taken in isolation could be interpreted in more than one way. *Id.* "[O]ne may not, by pointing out a single sentence or clause, create an ambiguity." *Id.* (quoting *Yarborough v. Phoenix Mut. Life Ins. Co.,* 266 S.C. 584, 592, 225 S.E.2d 344, 348 (1976)).

> In construing and determining the effect of a written contract, the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument, and when such contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed. Hence words cannot be read into a contract which import an intent wholly unexpressed when the contract was executed.

*Id.* (quoting *McPherson v. J. E. Sirrine & Co.,* 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945)).

We find the language of the MSA is unambiguous and the full payment of the balance due Wife on the note satisfied Husband's alimony obligation, and reverse. When the language of an agreement is clear and unambiguous, courts may look no further than the agreement itself to discern the parties' intent. *Ard,* 399 S.C. at 237, 730 S.E.2d at 914; *accord Davis,* 372 S.C. at 75, 641 S.E.2d at 452.

The language of the MSA is not ambiguous. It required Husband to pay Wife "the sum of Seven Thousand and 00/100 ($7,000.00) Dollars per month as alimony," with a maximum of one hundred twenty payments. The MSA did not predicate this amount upon either party's receipt of other income; however, it stated the $7,000 would be:

[O]ffset dollar for dollar for any interest income Wife receives from her share of the note receivable from [the LLC]. [Moreover, i]f [the LLC] ever reduces the principal on the debt due to Wife for the note receivable, then in such event Husband's alimony obligation to Wife shall automatically reduce proportionate to the reduction made in the principal obligation.

The amendment to the MSA further permitted Husband's monthly alimony obligation to be offset, dollar for dollar, by any employment income the LLC paid to Wife. We find these terms are clear.

Applying these terms to the situation at hand, we find the family court erred in finding the MSA required Husband to pay Wife $1,000 per month in alimony after the LLC fully satisfied its debt to her. *See Davis*, 372 S.C. at 75, 641 S.E.2d at 451–52 ("Unambiguous marital agreements will be enforced according to their terms ..., regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully."). The MSA unequivocally states Husband's alimony obligation "shall automatically reduce" in proportion to the reduction of principal on the LLC's debt to Wife. This provision contains no limiting language that would prevent a one hundred-percent reduction in the principal from reducing Husband's alimony obligation by one hundred percent. Further, no language in the MSA establishes a minimum amount of alimony Husband must pay after the note's principal had been eliminated.

Although the MSA does not per se discuss the "termination" of Husband's alimony obligation, neither does it contemplate the alimony obligation continuing indefinitely. In addition to listing other events that would end Husband's alimony obligation, the MSA provides for the full satisfaction of that obligation, either after Husband tendered one hundred twenty payments or after the LLC extinguished its loan obligation to

Wife. The latter occurred. Because the LLC paid one hundred percent of its loan obligation to Wife, Husband's alimony obligation to Wife decreased by one hundred percent. Accordingly, the family court erred in extending Husband's alimony obligation and in finding the MSA required him to pay Wife $1,000 per month after Wife received full repayment of the LLC's loan obligation.

## CONCLUSION

We find the language of the parties' settlement agreement is clear and unambiguous. We further find the terms of that agreement established Husband's alimony obligation to Wife was $7,000 per month and specified that obligation would reduce in proportion to the LLC's reduction of the principal it owed to Wife. In view of these provisions, we find the LLC's payment of one hundred percent of its loan obligation to Wife caused Husband's monthly alimony obligation to be reduced by one hundred percent, to zero dollars. Accordingly, the decision of the family court is

**REVERSED.**